**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI CENTRAL DIVISION**

| | | |
|---|---|---|
| PATRICIA GARRETT,<br><br>Plaintiff,<br><br>v.<br><br>BEHAVIORAL HEALTH CONCEPTS, INC.<br><br>and<br><br>MISSOURI DEPARTMENT OF CORRECTIONS,<br><br>Defendants. | ) | Case No. 04-4103-CV-C-NKL |

**ORDER**

Pending before the Court is Behavioral Health Concepts, Inc.'s ("BHC") Motion for Summary Judgment [Doc. # 68]. After BHC filed its Motion and before the Court issued this Order, BHC and Patricia Garrett ("Garrett") settled their dispute. Therefore, the Court will deny BHC's Motion as moot and dismiss Garrett's claims against BHC pursuant to the settlement agreement.

Also pending is the Missouri Department of Corrections' ("DOC") Motion for Summary Judgment [Doc. # 67]. For the reasons set forth below, the Court grants in part and denies in part DOC's Motion.

## I. Background

Garrett was a provisionally licensed professional counselor in the mental health

unit at the South Central Correctional Center ("SCCC"). Garrett served in this position from March 2002 to August 1, 2003.

DOC operated SCCC and BHC had a contract to provide mental health services to inmates at SCCC. BHC leased its employees from a staffing agency named Moresource, Inc. ("Moresource"). Garrett was an employee of Moresource, but she had to comply with the policies and procedures of DOC, BHC, and Moresource.[1] DOC had authority to approve or disapprove of any staff provided by BHC and Moresource and it could request the removal of any of BHC's staff from SCCC.

Glen Marsey ("Marsey"), a DOC employee, supervised Garrett's daily activities at SCCC. Marsey also supervised Larry Cloninger ("Cloninger"), a licensed professional counselor. Cloninger supervised Garrett for licensing purposes.

### A. Factual Overview

On October 1, 2002, Garrett complained to BHC about the working conditions under Marsey. Garrett did not allege sexual harassment or gender-based discrimination, but she did allege that Marsey constantly implemented new rules. Garrett also complained that Marsey caused personnel problems in the medical unit, that he imposed restrictions related to the number of inmates staff were allowed to treat, and that he prohibited members of his staff from talking to people outside the mental health

---

[1]For purposes of its Motion, DOC does not contest that Garrett's Title VII claims against it are cognizable and it does not assert the absence of an employment relationship as a defense. *See* DOC Motion [Doc. # 67] at p. 2, n. 1.

department at SCCC without his permission.

BHC investigated Garrett's complaint and discovered that its staff at SCCC had difficulties with Marsey. BHC felt Marsey's leadership was inconsistent and it recommended to DOC that Marsey undergo management training.

At some point during Garrett's employment, Marsey asked Cloninger if he and Garrett were sexually intimate after Cloninger expressed support for Garrett. Cloninger testified that he and Marsey were discussing Garrett and, after Cloninger supported her in the dispute, Marsey asked if they were sexually intimate with each other. Garrett was not present during this conversation and she learned about it only after Cloninger told her--Marsey never mentioned it to Garrett or directed the comment to her.

On May 13, 2003, Garrett filed a complaint of sexual harassment against Marsey. Garrett filed her complaint with Michael Bowersox ("Bowersox"), who was the superintendent of SCCC. In her complaint Garrett alleges that she and other employees were subjected to crude and sexually-related taunting and correspondence from inmates at SCCC. The policy was to return the letters unopened to the inmate. However, during a staff meeting on May 13, Marsey opened two offensive letters that were addressed to Garrett from inmates and read them out loud in front of the staff. Marsey then implied that Garrett's behavior somehow invited these letters, even though Garrett's male counterparts in the mental health unit also received letters with sexual content from inmates.

In addition to her complaint about the letters, Garrett complained that Marsey

treated her differently because she was a woman. For example, Marsey referred to Garrett as "Ms. Patti" instead of a more professional title, prohibited Garrett from communicating with staff in other departments, and limited the number of inmates she could treat which impacted her licensing requirements. Garrett also alleged that Marsey told her she should dress more like a man and she should limit the amount of time she spent with the inmates.

Bowersox undertook an investigation into Garrett's allegations against Marsey. During the course of the investigation, Garrett's office was temporarily moved from the mental health unit to a housing unit at SCCC so she would not be required to have contact with Marsey. DOC stated that it did not move Marsey because he had supervisory responsibilities for several individuals and temporarily relocating him would be too disruptive. In her new location, Garrett had full access to her computer files and her job duties remained the same. Garrett was allowed to contact her co-workers in the medical unit, but Bowersox limited her physical access to the unit except for when she was clocking in or out. Bowersox testified that he did not move Garrett to punish her or retaliate against her for filing her complaint. Garrett protested her relocation in a memorandum dated May 30, 2003. She stated that she believed the relocation was retaliatory and that the new location of her office would disrupt her ability to perform her job duties.

On May 23, 2003, Garrett received a written reprimand from BHC because she allegedly released confidential information regarding an inmate's inter-facility transfer

date in violation of DOC policy.

On June 24, 2003, Bowersox notified Garrett that his investigation did not substantiate her allegations against Marsey. Garrett was moved back into the medical unit and placed under Marsey's supervision. Garrett protested her move back into the mental health unit under Marsey's supervision in a memorandum dated June 25, 2003. Garrett stated that she believed Marsey would retaliate against her.

On July 2, 2003, Marsey filled out Garrett's performance evaluation for the period from March 2002 to March 2003. Marsey rated Garrett as a "satisfactory" employee and he did not include any particularly negative comments. *See* Garrett Ex. 8 at p. 171.

On July 21, 2003, Garrett filed a formal charge of discrimination with the EEOC wherein she alleged sexual harassment and sexual discrimination against DOC and BHC.

On August 1, 2003, Bowersox submitted a memorandum to Garrett notifying her that she was banned from SCCC. The memorandum did not provide a reason for banning Garrett from SCCC. After Garrett was banned from SCCC, BHC recommended to Moresource that it terminate Garrett's employment, which it did.

Bowersox stated that he banned Garrett from SCCC "based on reports provided by custody staff responsible for inmates in Housing Units 1 and 2 . . . . Those reports informed me that on more than one occasion [] Garrett had either refused or failed to comply with custody staff directives. It was my belief that her failure to follow custody staff directions posed a potential threat to the safety and security of institutional operations." *See* DOC Ex. B at ¶ 6. In his deposition, Bowersox conceded that he never

asked Garrett about these allegations or gave her an opportunity to respond to them. He also stated, "It was an accumulation, it was the ongoing reports by staff verbally and both in writing regarding Ms. Garrett's behavior or actions" that led to the August 1 memorandum. In his deposition, Bowersox also opined that he would not discipline an employee of DOC without first investigating the alleged wrongdoing and interviewing the employee to get the employee's side of the story.

Garrett amended her charge of discrimination on August 9 to include DOC's banning of her from SCCC and the termination of her employment by BHC.

**B. Cloninger**

Garrett concedes that Marsey gave Cloninger and other employees contradictory instructions and that he frequently changed the rules and systems for these employees. Garrett also concedes that Marsey constantly changed the job assignments for Cloninger and that those changes became worse and more frequent over time. Garrett also concedes that Marsey forbade Cloninger from talking with staff outside the mental health unit and that he limited the number of patients that Cloninger could see.

Cloninger served as a witness during DOC's investigation into Garrett's claims against Marsey. During the investigation, Cloninger verbally indicated to the investigator that he believed Marsey treated Garrett differently from the male employees in the mental health unit. When Cloninger was asked to respond to written questions during the investigation, he stated, "I am not comfortable about making a written statement until or without the advise [sic] of counsel." Cloninger was terminated from his employment a

few days after declining to fill out the written questionnaire.

### C. Garrett's Complaint

After being banned from SCCC, Garrett filed her Complaint in this Court against BHC and DOC. Count I of Garrett's Complaint seeks damages for sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Count II of Garrett's Complaint seeks damages for sexual harassment in violation of the Missouri Human Rights Act ("MHRA"). Count III seeks damages for retaliation against Garrett in violation of Title VII and the MHRA.

## II. Discussion

In Title VII cases, courts apply the familiar burden-shifting framework initially set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, there is a presumption of unlawful conduct by the employer after a plaintiff makes out a *prima facie* case. Then the burden of production shifts to the employer to present a legitimate, non-discriminatory reason for its conduct. *Haas v. Kelly Services, Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005) (citations omitted) (setting forth the burden-shifting framework). At this stage of the proceeding, the employer bears only the burden of production and not the burden of persuasion. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005) (citing *Krenik v. County of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995)). The defendant's burden of production is satisfied if it raises genuine issue of fact as to whether it engaged in unlawful conduct against the plaintiff. *Burdine*, 450 U.S. at

255.

If the employer satisfies its burden of production, then the presumption of unlawful conduct disappears and the plaintiff is required to prove by a preponderance of the evidence that the employer's stated reason was pretext for unlawful conduct.[2] *Haas*, 409 F.3d at 1035; *Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 897-98 (8th Cir. 2004) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004)).

**A. Garrett's Hostile Environment Claims**

To demonstrate a hostile working environment, Garrett "must show that she was subjected to unwelcome sex-based harassment that was sufficiently severe or pervasive to alter a term, condition, or privilege of her employment." *Cheshewalla v. Rand & Son Construction Co.*, __ F.3d __, 2005 WL 1668341 at *2 (8th Cir. July 19, 2005) (citing *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004)). The environment must be objectively hostile to a reasonable person and subjectively hostile to the victim. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). The conduct at issue "must be extreme and not merely rude or unpleasant." *LeGrand v. Area Resources for Community & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005) (citations omitted); *Sallis*, 408 F.3d at 477 ("rude" or "insensitive" conduct insufficient to support a claim for hostile

---

[2]The Eighth Circuit has held that this burden-shifting framework is still applicable at the summary judgment stage and that the framework was unaffected by the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148 (2003). *See Russell v. City of Kansas City, Missouri*, __ F.3d __, 2005 WL 1618784 at *3 (8th Cir. July 12, 2005) (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 735-36 (8th Cir. 2004)); *Torlowei v. Target*, 401 F.3d 933, 934 (8th Cir. 2005).

environment). To determine if a work environment is hostile or abusive, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sallis*, 408 F.3d at 477 (citing *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003)).

Garrett's claims fall generally into two categories: claims that she was treated differently from her male counterparts, and claims that involved inappropriate gender-related conduct by Marsey.

### *1. Different Treatment*

Regarding the first category, Garrett alleges that Marsey prohibited her from communicating with staff in other departments and limited the number of inmates she could treat which impacted her licensing requirements. Garrett also alleged that Marsey instructed her to limit the amount of time she spent with the inmates. Generally, Garrett asserted that Marsey was difficult to work with because he would frequently change job requirements and rules for his employees.

Garrett concedes that Marsey also restricted Cloninger–her male co-worker–from contacting employees in other divisions and that Marsey frequently changed the rules and procedures for other employees under his direction, including her male co-workers. Based on this admission, it appears that Marsey's erratic management style was applied equally to all of the employees in the mental health unit and it was not isolated to Garrett. Thus, a reasonable jury could not conclude that Marsey was singling out Garrett based on

her gender in violation of Title VII.

Regarding Garrett's allegation that Marsey limited the number of patients she could see, Garrett alleges that Cloninger was allowed to see more patients without reprimand.[3] However, Cloninger was Garrett's supervisor for licensing purposes and he was already a licensed supervisor; therefore, Cloninger and Garrett were not similarly situated employees. To be similarly situated to Garrett, Cloninger "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004) (citations omitted). Cloninger is undisputedly not a comparable employee to Garrett; therefore, her claim about Marsey's different standards for Cloninger are immaterial.

Again, a reasonable jury could not find that Marsey was maliciously targeting Garrett because of her gender based on the facts before the Court.

### *2. Gender-Related Inappropriate Conduct*

Regarding Marsey's alleged inappropriate conduct, Garrett alleges that he referred to her as "Ms. Patti" while referring to her male counterparts as "Dr." and their last name, he instructed her to dress like a man, he read a sexually explicit letter from an inmate during a staff meeting and implied that she had invited the letter through her conduct, and he once asked Cloninger if he and Garrett were sexually intimate after Cloninger

---

[3]In her brief, Garrett does not allege that any other mental health employees other than Cloninger were allowed to see more patients without reprimand.

defended her.

The two most egregious instances of inappropriate sexual conduct--Marsey's reading of the sexually explicit letter and Marsey asking Cloninger about a sexual relationship with Garrett–were admittedly isolated incidents that were not recurring. In the Eighth Circuit, isolated incidents generally cannot be the basis of hostile environment claims, unless they are particularly egregious. *See Klein v. McGowan*, 198 F.3d 705, (8th Cir. 1999) ("Simple teasing, offhand comments, and isolated incidents generally cannot amount to severe or pervasive harassment."); *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958 (8th Cir. 1999) (more than a few isolated incidents are required). Thus, even though Marsey's conduct was unprofessional, boorish and based on Garrett's gender, it was not sufficient to establish a hostile environment under the precedents in the Eighth Circuit.

Similarly, Marsey's references to Garrett as "Ms. Patti" and his instruction to her to dress more like a man cannot sustain her claim of a hostile environment. The record is unclear how many times these incidents occurred, but their numerosity is immaterial because they were not severe under Eighth Circuit precedents. Marsey's comments were rude, insensitive and based on Garrett's gender, but that is not sufficient to establish a severe and pervasive work environment. *Sallis*, 408 F.3d at 477 ("rude" or "insensitive" conduct insufficient to support a claim for hostile environment).

The Court reaches thee conclusions because Garrett's complaints about the working environment at SCCC are substantially less egregious than other cases where the Eighth Circuit has found that a hostile environment did not exist. *See LeGrand*, 394 F.3d

1098 (no hostile environment where alleged harasser physically grabbed and forcibly kissed plaintiff); *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003) (no hostile environment where co-worker grabbed the plaintiff's buttocks and then confronted her about it); *Tuggle v. Mangan*, 348 F.3d 714 (8th Cir. 2003) (no hostile environment where co-worker made a number of comments based on the plaintiff's sex and posted a photograph showing the plaintiff's "clothed rear end"); *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002) (no hostile environment where harasser propositioned the plaintiff for a relationship, improperly touched the plaintiff's hand several times, and displayed graphic and sexual items in his office and on his computer screen and required plaintiff to draw a sexually implicit subject as a test for promotion).

In light of these precedents, Marsey's conduct was insufficient to establish a hostile work environment. Accordingly, the Court will grant DOC's Motion on Garrett's hostile work environment claims contained in Counts I and II of her Complaint.

**B. Retaliation**

Garrett also has a claim for retaliation. If Garrett reasonably believed that DOC's conduct violated Title VII, then her retaliation claim is viable even though the underlying protected activity has been found to be insufficient to establish a Title VII violation. *See Wallace v. Sparks Health System*, __ F.3d __, 2005 WL 1679252 at *4 (8th Cir. July 20, 2005) ("We are mindful that an employee must be protected from retaliation for protected activity, even if a court eventually decides that the employee's complaints are without merit, as long as the employee reasonably believed the employer's conduct violated Title

VII.") (citation omitted); *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 714 (8th Cir. 2000) ("A finding of unlawful retaliation, however, is not conditioned on the merits of the underlying discrimination complaint.") (citation omitted). DOC does not assert that Garrett acted in bad faith or unreasonably when she engaged in the protected activity, and there does not appear to be a basis for such a claim. Therefore, her claim for retaliation warrants further consideration by the Court.

To sustain her retaliation claim, Garrett must demonstrate (1) she engaged in statutorily protected conduct;[4] (2) there was an adverse employment action; and (3) a causal connection exists between her conduct and the adverse action. *Sallis*, 408 F.3d at 477 (citing *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003)). The causation element is generally a jury question and it can be the basis for summary judgment only where "the question is so free from doubt as to justify taking it from the jury." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (citation omitted).

***1. Adverse Action***

One of the elements for a retaliation claim is the existence of an adverse employment action. To constitute an adverse employment action, the allegedly wrongful conduct must "have an adverse impact on the employee and must effectuate 'a material change in the terms or conditions of . . . employment.' Stated another way, 'proof of an adverse employment action requires a tangible change in duties or working conditions

[4]For purposes of its Motion, DOC concedes that Garrett engaged in statutorily protected conduct when she complained about Marsey's behavior.

that constitute a material disadvantage.'" *Jones v. Fitzgerald*, 285 F.3d 705, 713 (8th Cir. 2002) (internal citations omitted). Examples of material disadvantages that may constitute an adverse employment action include a detrimental change in salary, benefits, or responsibilities. *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003). Actions short of termination may constitute an adverse employment action, but "not everything that makes an employee unhappy is an actionable adverse action." *Id.*

Garrett alleges that DOC retaliated against her when it temporarily relocated her office from mid-May to late June 2003 and prohibited her from entering the medical unit except to check in or out, although she was allowed to contact staff in the mental health unit as necessary to perform her job. Garrett admits that her job duties did not change and, other than her physical location, her job was substantially the same as it was prior to her complaint in mid-May. Therefore, Garrett has failed to show how this alleged conduct effectuated a "material change" in the terms of her employment. *Jones*, 285 F.3d at 714. The Court acknowledges that Garrett was inconvenienced by her relocation and exclusion from the facility, but inconvenience alone is not tantamount to an adverse employment action. *See Sallis,* 408 F.3d at 476 ("Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action.") (citation omitted). Therefore, Garrett's allegation of retaliation based solely on her temporary relocation must fail.

Garrett also alleged that the change in her ability to use flex time was retaliatory. However, Garrett admits that BHC eliminated flex time for all of its mental health

employees; therefore, Garrett's allegation regarding flex time must fail.

Finally, Garrett alleges that her written warning on May 23, 2003, was retaliatory, but she does not allege that it culminated or contributed to a change in the material terms of her employment. Courts hold that where a negative memorandum in a personnel file does not form the basis for subsequent adverse action, then the memorandum alone does not constitute its own form of adverse action. *Jones v. Fitzgerald*, 285 F.3d 705, 714 (8th Cir. 2002) (presence of a negative memorandum in a personnel file, without more, does not constitute adverse action). *See also LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 692 (8th Cir. 2001) ("[A] negative review is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment . . . ."). Therefore, because the written warning did not culminate in a change in the terms of her employment, Garrett's warning cannot be the basis of her retaliation claim.

Accordingly, the vast majority of Garrett's retaliation claims fail as a matter of law because they did not constitute an adverse employment action--a primary element of any retaliation claim. However, it is clear[5] that banning Garrett from SCCC is an adverse employment action; therefore, the Court will next consider the submissibility of that claim.

### ***2. Ban from SCCC***

---

[5]For purposes of its Motion, DOC concedes that Bowersox's decision to ban Garrett from SCCC was an adverse employment action. *See* DOC Motion [Doc. # 67] at p. 21, n. 6.

The Eighth Circuit has held that a time interval between the protected activity and the adverse action greater than a few months cannot give rise to an inference of retaliation. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999) (four month interval between protected activity and adverse action not sufficient for inference of retaliation); *Kipp v. Missouri Highway & Transp. Comm'n*, 280 F.3d 893, 896-97 (8th Cir. 2002) (two month interval insufficient); *Ghane v. West*, 148 F.3d 979 (8th Cir. 1998) (one month interval insufficient). However, in the cases outlined above which were cited by DOC, the temporal proximity was one of just a few factors that supported a finding of retaliation. In the instant case, there are several factors that may cause a reasonable jury to infer that Bowersox intended to retaliate against Garrett and those are set forth below.

Moreover, in addition to the temporal proximity being but one factor the Court considers, DOC's position ignores the fact that Garrett's protected activity was ongoing throughout the summer of 2003 and it was not isolated to her initial complaint filed on May 13, 2003. For example, on May 23, 2003, Garrett complained to DOC when it transferred her out of the mental health unit and she specifically stated that she believed her transfer was retaliatory. Then, a few days after the DOC concluded its investigation into Marsey's alleged conduct and transferred Garrett back under Marsey's supervision in late June 2003, Garrett again complained and she specifically stated that she believed Marsey would undertake retaliatory conduct against her. Most importantly, on July 21, 2003, Garrett filed a formal charge with the EEOC alleging sexual harassment and sex discrimination against DOC and BHC. In less than ten days after filing that dual charge,

she was banned by Bowersox. Her termination also occurred approximately thirty days after Bowersox's investigation concluded and his announced decision that her claims were meritless. Under these circumstances, a jury could consider timing as one factor to support a conclusion that Bowersox banned Garrett because of the protected activity that she engaged in.

In addition to temporal proximity, there is evidence that Bowersox's justification for the ban was pretextual. Viewing the evidence in the light most favorable to the Plaintiff, Bowersox did not follow his own stated procedures for handling investigations and his stated reasons for banning her are vague. In his deposition, Bowersox opined that he would not discipline an employee of DOC without first investigating the alleged wrongdoing and interviewing the employee to get the employee's side of the story. However, in this case, Bowersox did not contact Garrett nor did he investigate the alleged security shortcomings that resulted in her ban from SCCC. The Court is mindful that it does not sit as a "super-personnel department" and that Bowersox is under no obligation to consult with an employee before he bans the employee from SCCC. *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005). However, the fact that Bowersox's conduct vis-a-vis Garrett is inconsistent with how he testified that he would conduct an investigation may lead a reasonable jury to infer that he had a retaliatory animus when he banned Garrett from SCCC. The Court's finding does not rest on the "fairness" of Bowersox's conduct, as DOC argues in its brief; instead, it looks to whether Bowersox's conduct with respect to Garrett was abnormal and, according to Bowersox's own

testimony, his treatment of Garrett was out of the norm for DOC employees.

Bowersox's abnormal treatment of Garrett is further suspect in light of the reasoning behind his decision to ban her from SCCC. Bowersox stated in his affidavit that he banned Garrett from SCCC "based on reports provided by custody staff responsible for inmates in Housing Units 1 and 2 . . . . Those reports informed me that on more than one occasion [] Garrett had either refused or failed to comply with custody staff directives. It was my belief that her failure to follow custody staff directions posed a potential threat to the safety and security of institutional operations." *See* DOC Ex. B at ¶ 6. In his deposition, Bowersox testified about the decision to ban Garrett and stated, "It was an accumulation, it was the ongoing reports by staff verbally and both in writing regarding Ms. Garrett's behavior or actions" that led to the August 1 memorandum.

Bowersox does not identify which DOC custody employees initiated the "ongoing reports" against Garrett nor does he specify which directives Garrett failed to follow. In his deposition, Bowersox referenced written reports against Garrett, but he has not produced any of those documents to the Court.

Moreover, Bowersox's reasoning does not comport with Marsey's evaluation of Garrett that was completed on July 2, 2003. Marsey rated Garrett's performance as "satisfactory" and he did not include any particularly negative comments. Marsey's evaluation of Garrett is inconsistent with Bowersox's claim of "ongoing reports" that continued to accumulate to the point that Bowersox had to ban Garrett from SCCC. Presumably, if such complaints against Garrett existed, Marsey would have noted them in

his annual review of Marsey, which was drafted less than one month before Bowersox banned Garrett from SCCC.

Additionally, Garrett's positive work history at DOC is not consistent with Bowersox's stated reasons for banning her from SCCC. Bowersox's reasoning implies that he had received several complaints about Garrett yet none of these complaints were documented in her personnel file nor were they ever discussed with her. But for one minor reprimand in May 2003, which appears to be unrelated to her ban from SCCC in August, Garrett had a positive work history at DOC. Even though Bowersox had conducted a month long investigation into Garrett's complaint against Marsey, Bowersox does not indicate that he learned anything about Garrett's policy violations. If Garrett posed a security threat to the institution, a reasonable juror could conclude that it would be mentioned during Bowersox's investigation of Garrett and her immediate supervisor.

Given the dearth of objective evidence supporting Bowersox's stated reasons for banning Garrett and the evidence that does not comport with those reasons, a reasonable jury may disbelieve Bowersox's proffered reason for banning Garrett from SCCC and, instead, find that Bowersox's true motive for the ban was that Garrett had made too many complaints. *See Reeves v. Sanders Plumbing Products, Inc.*, 530 U.S. 133, 147-148 (2000) (disbelief of employer's proffered reason for adverse employment action in conjunction with *prima facie* evidence of discrimination can support conclusion that discrimination has occurred).

## III. Conclusion

Accordingly, it is hereby ORDERED that

(1) DOC's Motion for Summary Judgment [Doc. # 67] is GRANTED as to the sex harassment claim and is DENIED as to the retaliation claim;

(2) BHC's Motion for Summary Judgment [Doc. # 68] is DENIED as moot; and

(3) Garrett's claims against BHC are dismissed in their entirety.

DATED: August 19, 2005
Jefferson City, Missouri

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge